FILED

2022 Sep-28  AM 08:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | |
|---|---|
| EMILIE WHITT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 4:21-cv-00198-NAD |
| | ) |
| SOCIAL SECURITY | ) |
| ADMINISTRATION, | ) |
| COMMISSIONER, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER
## <u>AFFIRMING THE DECISION OF THE COMMISSIONER</u>

Pursuant to 42 U.S.C. § 405(g), Plaintiff Emilie Whitt appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") on her claim for disability benefits.  Doc. 1.  Plaintiff Whitt applied for supplemental security income (SSI) benefits with an alleged onset date of March 8, 2018.  Doc. 10-6 at 2–16.  The Commissioner denied Whitt's claim for benefits.  Doc. 10-3 at 2–4, 8.

Pursuant to 28 U.S.C. § 636(c)(1) and Federal Rule of Civil Procedure 73, the parties consented to magistrate judge jurisdiction.  Doc. 13.  After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

1

## ISSUES FOR REVIEW

In this appeal, Plaintiff Whitt argues that the court should reverse (1) because the Administrative Law Judge (ALJ) erred in "giving virtually no weight to the opinions of Dr. [June] Nichols," and (2) because the ALJ erred in not "properly rebutt[ing] [Whitt's] testimony."  Doc. 1; Doc. 17 at 12, 19.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages: (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council.

*See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled.  The ALJ must determine the following:

(1)   whether the claimant is engaged in substantial gainful activity;

(2)   if not, whether the claimant has a severe impairment or combination of impairments;

(3)   if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)   if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and

(5)   if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211.  At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)).   If the

Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs. *Id.* So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant. *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act. The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.** With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial

4

evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

**B.** With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.

## BACKGROUND

### A.   Procedural background

On June 5, 2019, Plaintiff Whitt applied for SSI benefits under Title XVI of the Social Security Act.  Doc. 10-6 at 2–16.  In her application, Whitt alleged that she became disabled on March 8, 2018.  Doc. 10-6 at 2, 10.

On August 16, 2019, the SSA initially found that Whitt was not disabled (Doc. 10-4 at 17, 20), and on August 27, 2019, the SSA informed Whitt that her claim for SSI benefits had been denied (Doc. 10-5 at 5–9).

The SSA granted Whitt's request for a hearing (Doc. 10-5 at 4, 10–12); and,

on May 18, 2020, a hearing was held by teleconference before an ALJ (Doc. 10-3 at 38–81; Doc. 10-5 at 15–30).  A vocational expert or "VE"—Marvin Bryant—also appeared and testified at the hearing.  Doc. 10-3 at 38, 74–80.

On November 3, 2020, the ALJ issued an unfavorable decision, finding that Whitt was not disabled under the Social Security Act.  Doc. 10-3 at 8–34.

On February 2, 2021, Whitt appealed that decision through counsel.  Doc. 10-5 at 56–59.  On December 9, 2020, the SSA Appeals Council denied Whitt's request for review, finding that there was "no reason under [its] rules to review the Administrative Law Judge's decision."  Doc. 10-3 at 2.

After the Appeals Council denied Whitt's request for review (Doc. 10-3 at 2–4), the ALJ's decision became final for purposes of judicial review.  *See* 42 U.S.C. § 405(g).

### B.     Factual background, and the ALJ hearing

Whitt was born on July 21, 1981.  Doc. 10-6 at 2, 10; Doc. 10-7 at 2.  In her initial application, Whitt noted that, while she is married, she has been separated from her spouse for 9 years.  Doc. 10-6 at 3, 11.  Whitt lives with her boyfriend, who pays for utilities and food.  Doc. 10-6 at 3, 11.

In her initial application for benefits, Whitt claimed that she became disabled on March 8, 2018.  Doc. 10-6 at 2, 10; Doc. 10-7 at 2.  On June 7, 2019, in connection with her initial application, Whitt completed a disability report.  Doc. 10-7 at 5–13.

In that report, Whitt stated that she was unable to work because of high blood pressure, stroke, depression, anxiety, back problems, and knee problems. Doc. 10-7 at 6. Whitt stated that she last worked on March 1, 2018, and that she had to quit working because of her medical conditions. Doc. 10-7 at 6. She also stated that she completed eighth grade in 1994, and that she has not had any specialized job training, or trade or vocational schooling. Doc. 10-7 at 7.

On June 21, 2019, Whitt submitted an adult function report. Doc. 10-7 at 1, 16–23. Whitt reported that during a typical day her boyfriend helps her get up to take her medications, and that, after her medications kick in, he helps her get dressed and put on shoes. Doc. 10-7 at 16. She reported that she tries to watch television, "but [her] anxiety is high and won't let [her] brain slow down." Doc. 10-7 at 16. She also reported that she tries to complete housekeeping, but that she has to sit back down because of her pain level. Doc. 10-7 at 16.

Whitt reported that her "legs swell and it hurts to put pants on or shoes," but that she is able to take care of most of her personal needs. Doc. 10-7 at 17. She also reported that she needs to use a shower chair, and that her boyfriend "has to help [her] out of chairs or [the] couch." Doc. 10-7 at 17. She reported that she can make her own meals, but that her boyfriend reminds her to take her medication. Doc. 10-7 at 18. Whitt reported that "[o]nce a week [she] do[es] laundry all day," and that "[c]leaning house takes all day or more." Doc. 10-7 at 18.

Whitt also reported that she goes outside "at least once a day," and that she can drive, but that she prefers not to go out alone because she is a fall risk. Doc. 10-7 at 19. She reported that she can go shopping and manage money. Doc. 10-7 at 19. Whitt also reported that she enjoys watching television, playing games on her phone, and texting friends. Doc. 18-7 at 20.

Whitt reported that her conditions have affected her ability to do the following: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, stair climbing, remembering, completing tasks, concentrating, understanding, using hands, and getting along with others. Doc. 10-7 at 21. She reported that she can only lift "about 15 pounds," and that she can only walk a few feet without needing to rest. Doc. 10-7 at 21. She reported that she does not follow written instructions well, but that she can follow spoken instructions better than written. Doc. 10-7 at 21.

Whitt also reported that she uses a cane "to walk long distance[s]," and that her left hand stays numb and "tingles all the time." Doc. 10-7 at 22–23. She reported that she loses concentration easily, that "understanding is hard because her mind wanders," and that she cannot "complete a lot of tasks." Doc. 10-7 at 23.

On November 8, 2019, Whitt also completed a work background report. Doc. 10-7 at 52. In that report, Whitt stated that she worked as a private caregiver from 2009 to 2018. Doc. 10-7 at 52. After that job ended, Whitt worked for three months

as a breakfast cook and cleaner at a Best Western, and for three months cleaning restrooms and showers at a Petro station, both in 2018.  Doc. 10-7 at 52.

At the May 2020 ALJ hearing, Whitt testified that she finished school through eighth grade, that she did not obtain a GED, and that she had not received any other education or training.  Doc. 10-3 at 46.

Whitt testified that most of her past work was as a caregiver, but that it had become too difficult to help lift patients and to help patients get up and walk.  Doc. 10-3 at 47, 49.  Whitt testified that she worked as a caregiver for ten years and tried to work in that role again in May 2019, but that she was only able to work for two days.  Doc. 10-3 at 47.  That was Whitt's only work in the year before the ALJ hearing.  Doc. 10-3 at 47.

Whitt also testified that when she worked as a cleaner at Petro she did not have to lift as much, but that the position as a cleaner involved more "motion work" cleaning public restrooms, which aggravated her knees and back.  Doc. 10-3 at 55–56.  She testified that she left that job because it was "much [more than] one person could do."  Doc. 10-3 at 57.  She also testified that "moving through a bunch of people" would send her "into a panic attack."  Doc. 10-3 at 59.  She testified that she "got talked to quite a few times" for taking breaks outside of her regular break time.  Doc. 10-3 at 60.

Whitt testified that her last full-time job was at Best Western, where she

worked for three months.  Doc. 10-3 at 56, 59.  In that job, she "was the breakfast cook," and after breakfast she had to "clean all the public areas, the bathrooms," and "dust and vacuum."  Doc. 10-3 at 58.  She testified that this made her back and knees hurt more.  Doc. 10-3 at 58.  She also testified that she had panic attacks "several times" while she was working at the Best Western, and that her supervisor did not care when she reported that she was having issues with anxiety.  Doc. 10-3 at 59–60.

Whitt testified further that back pain from her degenerative disc disease and knee pain from her degenerative bone disease are the conditions that most limit her ability to work.  Doc. 10-3 at 48.  She testified that she takes Gabapentin and Flexeril for those conditions, that they reduce her back pain, but that they do not completely alleviate the pain.  Doc. 10-3 at 48.  Whitt testified that she has never had knee or back surgery.  Doc. 10-3 at 49.

Whitt testified that her back pain makes it difficult for her to sit or stand for long periods of time, and that she uses ice packs and heating pads to help with the pain.  Doc. 10-3 at 49.  She also testified that her knee pain prevents her from walking or standing for long periods of time, and that she could no longer bend down to pick up a patient's feet in her job as a caregiver because she could not stand back up. Doc. 10-3 at 50.

The ALJ asked Whitt if she had "any other physical problems that are

affecting [her] ability to work."  Doc. 10-3 at 50.  Whitt replied, "Pretty much just the back and the knees."  Doc. 10-3 at 50.

Whitt testified that mental conditions also affect her ability to work, including PTSD, OCD, and anxiety disorder.  Doc. 10-3 at 50.  Whitt testified that she would "have panic attacks when [she] tr[ied] to work, and just loud noises, a lot of people around [her]."  Doc. 10-3 at 51–52.  She testified that "[a]ny more than five people and [she] start[s] to get panicky."  Doc. 10-3 at 52.  Whitt testified that her panic attacks last "up to an hour," and that on average they occur about once per week. Doc. 10-3 at 52–53.  She testified that when she has a panic attack she has to walk away from whatever she is doing, either to go outside and take deep breaths or to sit by herself in a quiet room.  Doc. 10-3 at 52.

Whitt also testified that she would begin receiving treatment for her mental health conditions the month after the ALJ hearing.  Doc. 10-3 at 50–51.  She testified that she takes medications for her mental health conditions, including Wellbutrin and a generic for Lexapro.  Doc. 10-3 at 51.  Whitt testified that she had not received therapy or counseling in the past.  Doc. 10-3 at 51.

Whitt testified that she also had been recently referred for testing related to her heart beating too fast, and that her heart issues make her chest hurt and cause shortness of breath, which can lead to panic attacks.  Doc. 10-3 at 61–62.  Whitt also testified that she experiences headaches that occur after she has started to develop

chest pain.  Doc. 10-3 at 62.  She testified that she experiences dizziness and nausea from some of her medications, and that some make her sleepy, including the Flexeril. Doc. 10-3 at 62–64.  She also testified that she has gained weight because of her medications, and that they cause fatigue.  Doc. 10-3 at 65.

Whitt further testified that she had been using a cane for about a year, after a nurse practitioner suggested that she use it because she is a fall risk.  Doc. 10-3 at 67.  She testified that she has fallen when walking without the cane, and had an x-ray after a fall in the year before the ALJ hearing.  Doc. 10-3 at 68.  Whitt testified that her pain with medication is a 7 or 8 out of 10, and without medication it is a "10 plus" out of 10.  Doc. 10-3 at 69.  But she also testified that she did not know when she had last gone to the doctor for pain because of a lack of medication.  Doc. 10-3 at 69.

Whitt testified that she can drive for about twenty minutes and can generally sit for about twenty minutes before her back and hip begin to hurt.  Doc. 10-3 at 70–71.  She testified that she could not walk a city block because of her knees, back, and chest hurting.  Doc. 10-3 at 71.  She testified that she naps "[o]ne to two times a day" for "30 minutes, maybe longer," because her medications make her drowsy. Doc. 10-3 at 71–72.

A vocational expert (or "VE"), Marvin Bryant, also testified at the ALJ hearing.  Doc. 10-3 at 74–80.

VE Bryant described Whitt's past jobs as a short order cook and housekeeper as light work, her job as a home health aide as medium work, and her job as a restroom attendant as light, unskilled work.  Doc. 10-3 at 75.

VE Bryant testified that a hypothetical individual with Whitt's age, education, work experience, and ability to perform work at the light level, but with some physical and mental limitations,[1] could perform Whitt's past work as a restroom attendant, but not her past work as a composite short order cook/housekeeper.  Doc. 10-3 at 75–76.  Bryant also testified that the described hypothetical individual could perform other jobs, including work as a garment sorter and an agricultural products sorter.  Doc. 10-3 at 77.  Bryant testified that the same hypothetical individual still would be able to perform Whitt's past work as a restroom attendant and work as a garment sorter and agricultural products sorter, even with additional mental restrictions.[2]  Doc. 10-3 at 78.

---

[1] The hypothetical restrictions that the ALJ posed to the VE were as follows:  The individual "cannot work in environments with concentrated exposure to extreme cold or vibration; and must avoid all exposure to hazardous conditions, such as unprotected heights.  The individual can understand, remember, and carry out at least simple work instructions, but not those that are more detailed and complex; could adapt to occasional workplace changes; occasionally interact with the general public; frequently interact with coworkers and supervisors; and would be able to maintain attention and concentration to perform work at this level for at least two hour blocks of time, with normal breaks in an eight hour day."  Doc. 10-3 at 76.

[2] The additional, hypothetical mental restrictions that the ALJ posed to the VE were as follows:  The individual "could not perform work that would require interaction with the public; and could occasionally interact with coworkers and supervisors, meaning she could be around them throughout the work day, but would have only

Bryant testified that the same hypothetical individual, who was restricted to no interaction with the public and occasional interaction with coworkers and supervisors, and who also was limited to sedentary work, still could perform jobs in the national economy, including as a lens inserter, a nut sorter, and a final assembler. Doc. 10-3 at 79.  But Bryant testified that, if the hypothetical individual were absent from work "at least one day a week on an ongoing basis," this would preclude employment.  Doc. 10-3 at 79.  Likewise, Bryant testified that, if the individual could maintain concentration no more than two-thirds of the workday, "such a person would not be able to maintain competitive work."  Doc. 10-3 at 79.

### C.     Whitt's medical history and records

As explained above, Whitt has a history of high blood pressure, stroke, depression, anxiety, back problems, and knee problems, among other issues. However, Whitt's medical history related to these impairments is somewhat limited, and the records are especially sparse in the six months leading up to the May 2020 ALJ hearing.

Whitt visited the Gadsden Regional Medical Center multiple times between 2012 and 2019.  Doc. 10-8 at 144–68; Doc 10-10 at 101–218.  In November 2012, Whitt received treatment for a "mini-stroke," and was assessed with a clinical impression of hypertension and acute non-specific headache.  Doc. 10-10 at 185–

---

occasional conversations and interpersonal interactions."  Doc. 10-3 at 78.

201.   In July 2016, Whitt visited the Gadsden Regional emergency room, after an altercation with her mother and her boyfriend, and was evaluated by the mental health team.  Doc. 10-8 at 151–57.  The mental health team "recommend[ed] the patient be discharged," and found that Whitt did "not meet the criteria for treatment." Doc. 10-8 at 151.

On June 9, 2018, Whitt visited the Gadsden Regional emergency room "with abdominal pain and flank pain."  Doc. 10-8 at 155.  A review of systems noted that Whitt was "[c]ooperative," with "appropriate mood and affect," and that she had a normal range of motion.  Doc. 10-8 at 157.  She was discharged with pain medication and her discharge noted that testing was "unremarkable."  Doc. 10-8 at 158.

On December 17, 2018, Whitt went to the Gadsden Regional emergency room with "abdominal pain," and reported that she "started vomiting blood" and "has had a headache for 4 days in the back of her head."  Doc. 10-8 at 148.  Two CT scans during that visit indicated that Whitt had "[n]o acute intracranial abnormality," and "[n]o acute or aggressive abdominopelvic abnormality."  Doc. 10-8 at 144, 147.  A review of systems indicated that Whitt had a normal range of motion for her back and musculoskeletal system, and a normal neurological review.  Doc. 10-8 at 150. Whitt was discharged with medication for her pain.  Doc. 10-8 at 151.

Whitt also visited the Riverview Regional Medical Center in 2018.  Doc. 10-10 at 2–100.  On May 20, 2018, she visited the Riverview emergency room with

complaints of mid-chest pain and left shoulder pain.  Doc. 10-10 at 59.  At that visit, Whitt reported "that she ha[d] no physician and does not take anything for her blood pressure," and that she "smokes one pack per day of cigarettes."  Doc. 10-10 at 59. She exhibited a "[n]ormal range of motion," "no tenderness" to her musculoskeletal system, and was "alert and oriented to person, place, and time."  Doc. 10-10 at 60. She also visited the Riverview emergency room in November 2018 when, after "kneeling on a bar stool," she "fell off and landed on her left side."  Doc. 10-10 at 65.  On examination, Dr. Richard Karol (the ER physician) reported that there was "[n]o midline tenderness noted on palpation of the cervical spine," and "[n]o midline tenderness [was] noted on palpation of the thoracic and lumbar spine."  Doc. 10-10 at 67.

From November 2012 through December 2019, Whitt also went to medical appointments at Quality of Life Health Services in Gadsden, Alabama.  Doc. 10-8 at 4–102; Doc. 10-9.  Whitt first visited Quality of Life in November 2012, for follow-up after a stroke.  Doc. 10-9 at 2.  In December 2012, she saw CRNP Raymond Doty for her hypertension, which was "at fair control," and a headache, which the progress notes reported was likely the flu.  Doc. 10-9 at 7.

Throughout 2013, Whitt saw CRNP Doty and CNM Carole Campbell at Qualify of Life for a variety of minor complaints including hypertension and allergies, a follow-up from an emergency room visit, a headache, and an annual

gynecological exam.  Doc. 10-9 at 11, 15, 19, 23, 27, 34, 38, 41.

In 2014, Whitt visited Quality of Life with similar minor complaints, and for a follow-up for a miscarriage.  Doc. 10-9 at 46.

On December 14, 2018, Whitt visited Quality of Life complaining of anxiety, depression, and hypertension.  Doc. 10-9 at 51.  She stated that she was very anxious, and "had been recently in jail for 24 hours."  Doc. 10-9 at 51.

On January 11, 2019, Whitt presented for a follow-up visit and complained of hypertension, anxiety, and back pain.  Doc. 10-9 at 59.  With respect to her back pain, Whitt stated that she had "been moving and lifting a lot of boxes."  Doc. 10-9 at 59.  She visited again on February 12, 2019, and the progress notes reported that Whitt's back pain and anxiety were "improved."  Doc. 10-9 at 66.  On February 25, 2019, she presented for evaluation of knee pain and stated that "she woke up about a week ago and her [left] knee was hurting," but that there "was no actual injury." Doc. 10-9 at 72.

Whitt presented to Quality of Life several times in 2019 for a variety of conditions, including knee pain, hypertension, allergies, depression, anemia, gout, and edema.  Doc. 10-9 at 78, 84, 100, 109, 120.  A Quality of Life treatment note on April 10, 2019, reported that Whitt had fallen, but that the "xray of the knee shows no fracture," although Whitt "continues to complain of pain and is demanding narcotics which [the physician] declined."  Doc. 10-9 at 93.

On July 30, 2019, Whitt visited Dr. Jonathan Fuller at The Clinic of Gadsden for a consultative examination.  Doc. 10-8 at 131–35.  The notes from Dr. Fuller indicate that Whitt complained "of chronic low back pain, chronic knee pain, anxiety, depression, and hypertension."  Doc. 10-8 at 131.  At that appointment Whitt stated that her "anxiety and depression [were] currently moderately controlled with medication," and that her anxiety had "improved since family has moved out of her house."  Doc. 10-8 at 131.  In a review of systems, Whitt described her joint pain as "moderate," and Dr. Fuller noted that she had "no difficulty rising from a seated position."  Doc. 10-8 at 132.

On July 31, 2019, Whitt visited Dr. June Nichols at Gadsden Psychological Services, LLC for a consultative examination.  Doc. 10-8 at 137–40.  Whitt reported to Dr. Nichols that she started having panic attacks at age 14, and she was hospitalized "a couple years ago," but that she was "fighting with [her] mother about [her] boyfriend and [she] had some drug use that was going on."  Doc. 10-8 at 137.  Whitt also reported that "her medications have been beneficial to some degree," but that they do not help when she has "to be around a lot of people."  Doc. 10-8 at 137.

Dr. Nichols noted that Whitt's mood "was anxious, but congruent with thought processes," that her "[s]tream of consciousness was clear," that her "[s]peed of mental processing was adequate," and that her "memory functions appear[ed] to be grossly intact."  Doc. 10-8 at 138.  Dr. Nichols also found that Whitt's "[t]hought

processes were within normal limits," and her judgment and insight were "considered to be good." Doc. 10-8 at 139. But Dr. Nichols opined that Whitt was "unable to maintain attention/concentration and pace for periods of at least two hours," and was "unable to maintain a regular schedule, with appropriate punctuality." Doc. 10-8 at 140. Dr. Nichols also opined that Whitt was "unable to sustain an ordinary work routine without the need for special supervision," and "unable to maintain socially appropriate appearance, behavior, and other aspects of social interaction in the workplace." Doc. 10-8 at 140.

### D.    The ALJ's decision

On November 3, 2020, the ALJ issued an unfavorable decision on Whitt's claim. Doc. 10-3 at 8–34. The ALJ found that Whitt "has not been under a disability, as defined in the Social Security Act," since the date the application was filed. Doc. 10-3 at 12.

In the decision, the ALJ applied the five-part sequential test for disability (*see* 20 C.F.R. § 416.920(a); *Winschel*, 631 F.3d at 1178). Doc. 10-3 at 12–14. At step one of the sequential process, the ALJ found that Whitt had not engaged in substantial gainful activity since the application date. Doc. 10-3 at 14.

At step two, the ALJ found that Whitt had severe impairments of "obesity, spinal disorder, hypertension, degenerative joint disease, anxiety disorder, depressive disorder, and post-traumatic disorder (PTSD)." Doc. 10-3 at 14. The

ALJ noted that these medically determinable impairments "cause more than minimal functional limitation on [Whitt's] ability to perform work related duties" and "have persisted for more than twelve months."  Doc. 10-3 at 14.  The ALJ also found that Whitt had additional non-severe medically determinable impairments of substance abuse disorder, tachycardia, and gouty arthritis.  Doc. 10-3 at 14.

The ALJ also considered SSR (Social Security Ruling) 12-2p and SSR 19-4p to determine whether Whitt had medically determinable impairments of fibromyalgia and headaches.  Doc. 10-3 at 15–19.  Because of the "absence of objective documentation" of fibromyalgia, and because "there is absolutely no evidence establishing a primary headache disorder," the ALJ found that Whitt did not have medically determinable impairments of fibromyalgia or headaches.  Doc. 10-3 at 17, 19.

At step three, the ALJ found that Whitt did not have an impairment or combination of impairments that met the severity of the impairments in the SSA's "Listing of Impairments."  Doc. 10-3 at 19–22.

At step four, the ALJ concluded that Whitt was unable to perform any of her past relevant work.  Doc. 10-3 at 32.  The ALJ assessed Whitt's "residual functional capacity" (RFC) and found "[a]fter careful consideration of the entire record" that Whitt "has the residual functional capacity to perform sedentary work," and that she "can occasionally climb ramps and stairs, but never ropes, ladders or scaffolds,"

that she "can frequently balance, and occasionally stoop, kneel, crouch and crawl," that she "can constantly reach, handle, finger, and feel," but "cannot work in environments with concentrated exposure to extreme cold or vibration," and "must avoid all exposure to hazardous conditions such as unprotected heights."  Doc. 10-3 at 22.

With respect to Whitt's mental limitations, the ALJ's RFC determination included findings that Whitt "can understand, remember, and carry out at least simple work instructions, but not those instructions that are more detailed or complex," that she "can adapt to occasional workplace changes," but "can never perform work that requires interaction with the public and can occasionally interact with co-workers and supervisors," and that she "can maintain attention and concentration to perform work at this level for at least two hours at one time with normal breaks during an eight-hour day."  Doc. 10-3 at 22.

At step five, after considering Whitt's age, education, work experience, and RFC, the ALJ found "that there [were] jobs that exist in significant numbers in the national economy that [Whitt] can perform."  Doc. 10-3 at 33.

Consequently, the ALJ determined that Whitt was not disabled under the Social Security Act.  Doc. 10-3 at 34.  Because the Appeals Council found no reason to review the ALJ's opinion, the ALJ's decision became the final decision of the Commissioner.

## DISCUSSION

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on proper legal standards.

**I.  The ALJ properly assessed the opinions of Dr. June Nichols according to the applicable regulations, and substantial evidence supported the ALJ's decision to find that Dr. Nichols' opinions were not supported by and were inconsistent with the record evidence.**

The ALJ properly assessed the opinions of Dr. June Nichols pursuant to the applicable regulations, and substantial evidence supported the ALJ's decision to find that Dr. Nichols' opinions were not supported by and were inconsistent with the record evidence.  In her briefing, Plaintiff Whitt argues that "the ALJ erred in giving virtually no weight to the opinions of Dr. Nichols."  Doc. 17 at 12.

The SSA has revised its regulations on the consideration of medical opinions for all claims filed on or after March 27, 2017—like the claim in this case.  Under those revised regulations, an ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)," including the opinion of a treating or examining physician.  20 C.F.R. §§ 404.1520c(a), 416.920c(a).  And the Eleventh Circuit recently found that the SSA's new regulations validly abrogated the so-called "treating-physician rule," such that an ALJ no longer is required to defer to the medical opinion of a treating physician.  *See Harner v. Social Sec. Admin, Comm'r*, 38 F.4th 892 (11th Cir. 2022).

22

Instead, the ALJ considers the persuasiveness of a medical opinion according to the following five factors:  (1) supportability; (2) consistency; (3) the relationship with the claimant, including the length of the treatment relationship, the frequency of examinations, and the purpose and extent of the treatment relationship; (4) specialization; and (5) other factors, including evidence showing that the medical source has familiarity with other evidence or an understanding of the SSA's policies and evidentiary requirements.  20 C.F.R. §§ 404.1520c(c), 416.920c(c).

Supportability and consistency are the most important factors, and the ALJ must explain how the ALJ considered those factors.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  "Supportability" requires an ALJ to consider that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).  "Consistency" requires an ALJ to consider that "[t]he more consistent a medical opinion[] or prior administrative medical finding[] is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] or prior administrative medical finding[] will be."  20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).  The ALJ may explain how the ALJ considered the other factors, but the ALJ is not required to do so.  20 C.F.R.

§§ 404.1520c(b)(2), 416.920c(b)(2).

Moreover, a "statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean that [the SSA] will determine" that the claimant is "disabled." 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). That is because opinions about whether a claimant is disabled, the claimant's "residual functional capacity" (RFC), and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Any such statement from a treating physician may be relevant to the ALJ's findings but is not determinative, because it is the ALJ who must assess the claimant's RFC. *See, e.g.*, 20 C.F.R. §§ 404.1546(c), 416.946(c).

In this case, the ALJ applied those new, revised regulations. Dr. Nichols opined that Whitt was "unable to maintain attention/concentration and pace for periods of at least two hours," and was "unable to maintain a regular schedule, with appropriate punctuality." Doc. 10-8 at 140. Dr. Nichols also opined that Whitt was "unable to sustain an ordinary work routine without the need for special supervision," and "unable to maintain socially appropriate appearance, behavior, and other aspects of social interaction in the workplace." Doc. 10-8 at 140.

The ALJ found Dr. Nichols' opinions "to not be fully supported by or consistent with the ongoing treatment records." Doc. 10-3 at 29. The ALJ found

that "Dr. Nichols' opinion is not supported by the medical evidence in the record." Doc. 10-3 at 30.

According to the applicable regulations, the ALJ had to consider and explain the supportability and consistency of Dr. Nichols' opinions. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). Here, the ALJ's decision shows that the ALJ properly considered and explained the lack of supportability and consistency in Dr. Nichols' opinions.

In considering the supportability and consistency of those opinions (*see* 20 C.F.R. §§ 404.1520c(c), 416.920c(c)), the ALJ identified several inconsistencies between Dr. Nichols' examination notes and her opinions regarding Whitt's limitations. The ALJ found, for example, that Dr. Nichols provided that Whitt "would be able to manage basic self-care, and she would be able to understand, carry out, and remember simple one to two step instructions." Doc. 10-3 at 29. But the ALJ found that Dr. Nichols also had opined that Whitt would be "unable to maintain attention and concentration and pace for periods of at least two hours." Doc. 10-3 at 29. The ALJ also found that, while Dr. Nichols opined that Whitt "would be able to seek and accept appropriate instructions and criticism from supervisors," Dr. Nichols opined that Whitt "would be unable to sustain an ordinary work routine without the need for special supervision" and "would be unable to maintain socially appropriate appearance, behavior, and other aspects of social interaction in a

workplace." Doc. 10-3 at 30. Further, the ALJ found that, during Dr. Nichols'
examination of Whitt, Dr. Nichols reported that Whitt had clear and normal speech,
appropriate affect, clear stream of consciousness, normal orientation to her
environment, adequate mental processing, and fair memory. Doc. 10-3 at 26; *see*
Doc. 10-8 at 138–39. Those essentially normal findings do not support the severity
of the limitations in Dr. Nichols' opinions—particularly given that Dr. Nichols did
not explain the bases for her opinions.

The ALJ also considered the other record evidence in assessing the
supportability and consistency of Dr. Nichols' opinions. For example, the ALJ
found that, after Whitt "was forced to come to the emergency room by the police
after they were informed of her voiced suicidal ideation," she was evaluated by a
mental health team, who found that "she did not require inpatient hospital care and
could follow-up in outpatient for additional mental health treatment." Doc. 10-3 at
30. The ALJ also found that after Whitt was discharged she "never sought the
recommended treatment." Doc. 10-3 at 30. The ALJ found further that Whitt only
sought treatment "several years later because she was incredibly and understandably
upset and anxious after her arrest for drug paraphernalia and 24-hour incarceration,"
and that she only sought treatment "a few months later because she was court ordered
to attend a treatment program for her substance abuse." Doc. 10-3 at 30. The ALJ
found that Whitt "attended the required group therapy sessions and [was] placed on

a medication regimen which was adjusted periodically," and that "her symptoms appear to be well managed and she repeatedly rejected any counseling referrals." Doc. 10-3 at 30.

The ALJ found that, "while Dr. Nichols has indicated multiple symptoms and limitations, none of [Whitt's] symptoms are supported in [her] ongoing treatment records at Quality of Life Health Centers which routinely show normal mental status examinations and fairly good control of her symptoms."  Doc. 10-3 at 30.

Thus, the ALJ found that Dr. Nichols' opinions were not supported by, and were inconsistent with, both Dr. Nichols' own treatment notes and the other record evidence.  *See* 20 C.F.R. §§ 404.1520c(c), 416.920c(c).

In addition, substantial evidence supported the ALJ's findings regarding the lack of supportability and consistency with respect to Dr. Nichols' opinion.  Dr. Nichols stated that Whitt could not maintain attention and pace for 2 hours, could not maintain a regular schedule with punctuality, would miss more than 1-2 workdays per month due to "issues," and would need special supervision to sustain an ordinary work routine.  Doc. 10-8 at 140.  However, Dr. Nichols' notes from Whitt's mental status examination show basically normal observations other than an anxious mood.  Doc. 10-8 at 138–39.  Because those observations show no basis for the limitations that Dr. Nichols' opined Whitt would need, and because Dr. Nichols' opinions provide no explanation for why Whitt would be so limited, those

observations do not support Dr. Nichols' opinions about Whitt's limitations.

Furthermore, the opinion that Whitt would have such severe limitations is inconsistent with other record evidence. The record shows that Whitt consistently either did not qualify for or did not seek mental health treatment. Doc. 10-3 at 30, 51; Doc. 10-8 at 51. Medical records also show that Whitt was generally cooperative, appropriate, and well oriented at her medical visits. *See, e.g.*, Doc. 10-8 at 157; Doc. 10-10 at 60. Whitt's reports of anxiety were often tied to specific stressful events—including being incarcerated for 24 hours and having family living with her—rather than to consistent pathology. Doc. 10-8 at 131; Doc. 10-9 at 51. Moreover, Whitt reported in 2019 that her depression and anxiety were "moderately controlled with medication." Doc. 10-8 131. Thus, the record suggests that Whitt's depression and anxiety were reasonably managed and were not consistently severe, and that Whitt's impairments did not cause limitations at the level suggested by Dr. Nichols.

A "reasonable person would accept" the evidence that the ALJ reviewed as "adequate to support [the] conclusion" that Dr. Nichols' opinions were not supported by and were not consistent with the record evidence. *See Crawford*, 363 F.3d at 1158. Consequently, substantial evidence supported the ALJ's findings.

## II. The ALJ properly assessed Whitt's subjective testimony regarding her impairments.

The ALJ properly assessed Whitt's subjective testimony regarding her

impairments and associated pain.  The ALJ's decision was based on the multi-part "pain standard," and substantial evidence supported the ALJ's decision not to credit Whitt's subjective testimony regarding her pain.

### A.   The ALJ's decision properly was based on the multi-part "pain standard."

As an initial matter, the ALJ's decision properly was based on the multi-part "pain standard."  When a claimant attempts to establish disability through her own testimony concerning pain or other subjective symptoms, the multi-step "pain standard" applies.  That "pain standard" requires (1) "evidence of an underlying medical condition," and (2) either "objective medical evidence confirming the severity of the alleged pain" resulting from the condition, or that "the objectively determined medical condition can reasonably be expected to give rise to" the alleged symptoms.  *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *see also* 20 C.F.R. §§ 404.1529, 416.929 (standards for evaluating pain and other symptoms).

Then, according to both caselaw and the applicable regulations, an ALJ "will consider [a claimant's] statements about the intensity, persistence, and limiting effects of [her] symptoms," and "evaluate [those] statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [the claimant is] disabled."   20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4); *see Hargress v. Social Sec. Admin., Comm'r*, 883 F.3d 1302, 1307 (11th Cir. 2018).

Here, the ALJ's decision articulated and tracked that controlling legal

standard.  In analyzing Whitt's RFC, and the extent to which Whitt's symptoms limited her functioning, the ALJ's decision reasoned that the ALJ "must follow" the required "two-step process":   (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." Doc. 10-3 at 23.  The ALJ then applied the two-part test and found that Whitt's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," but that Whitt's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  Doc. 10-3 at 23.  Thus, the ALJ's decision was based on the proper legal standards.

> **B.    Substantial evidence supported the ALJ's decision to discredit Whitt's subjective testimony regarding her impairments and associated pain.**

Furthermore, substantial evidence supported the ALJ's decision not to credit Whitt's subjective testimony regarding her impairments and associated pain.

> **1.    The Eleventh Circuit requires that an ALJ must articulate explicit and adequate reasons for discrediting a claimant's subjective testimony.**

Under controlling Eleventh Circuit law, an ALJ must articulate explicit and

adequate reasons for discrediting a claimant's subjective testimony.  *Wilson*, 284 F.3d at 1225.  A claimant can establish that she is disabled through her "own testimony of pain or other subjective symptoms."  *Dyer*, 395 F.3d at 1210.

An ALJ "will not reject [the claimant's] statements about the intensity and persistence of [her] pain or other symptoms or about the effect [those] symptoms have" on the claimant's ability to work "solely because the available objective medical evidence does not substantiate [those] statements."  20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).

So, when an ALJ evaluates a claimant's subjective testimony regarding the intensity, persistence, or limiting effects of her symptoms, the ALJ must consider all of the evidence, objective and subjective.  20 C.F.R. §§ 404.1529, 416.929.  Among other things, the ALJ considers the nature of the claimant's pain and other symptoms, her precipitating and aggravating factors, her daily activities, the type, dosage, and effects of her medications, and treatments or measures that she has to relieve the symptoms.  *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Moreover, the Eleventh Circuit has been clear about what an ALJ must do, if the ALJ decides to discredit a claimant's subjective testimony "about the intensity, persistence, and limiting effects of [her] symptoms."  20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  If the ALJ decides not to credit a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so."  *Holt v.*

*Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

"A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995); *see Mitchell v. Commissioner of Soc. Sec.*, 771 F.3d 780, 792 (11th Cir. 2014) (similar). "The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable . . . [a reviewing court] to conclude that the ALJ considered [the claimant's] medical condition as a whole." *Dyer*, 395 F.3d at 1210 (quotation marks and alterations omitted).[3] "The question is not . . . whether [the] ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Commissioner of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

---

[3] The Social Security regulations no longer use the term "credibility," and have shifted the focus away from assessing an individual's "overall character and truthfulness"; instead, the regulations now focus on "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and[,] given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Hargress*, 883 F.3d at 1308 (quoting SSR 16-3p, 81 Fed. Reg. 14166, 14167, 14171 (March 9, 2016)). But, generally speaking, a broad assessment of "credibility" still can apply where the ALJ assesses a claimant's subjective complaints about symptoms and consistency with the record. *Id.* at 1308 n.3.

>    **2.    The ALJ properly explained the decision not to credit Whitt's subjective testimony regarding her impairments and pain, and substantial evidence supported that decision.**

The ALJ properly explained the decision to discredit Whitt's subjective testimony regarding her pain, and substantial evidence supported the ALJ's decision. In her brief, Whitt points out that she has "reported various complaints of back pain and right hip and thigh pain, sciatica on the right side, joint pain, bilateral foot pain, headaches, tenderness, numbness, tingling, and edema," and argues that these and other symptoms "would preclude [her] from sitting throughout the workday." Doc. 17 at 17, 19. Whitt then argues that "nowhere in [the ALJ's] decision has the ALJ properly rebutted this testimony." Doc. 17 at 19. However, the ALJ's decision not only articulated and tracked the multi-part "pain standard" (*see* Part II.A *supra*), but also tracked the Eleventh Circuit law and applicable regulations for evaluating a claimant's subjective testimony (discussed above in Part II.B.1 *supra*).

In determining Whitt's RFC (and citing 20 C.F.R. §§ 416.929, 416.920c and SSR 16-3p), the ALJ's decision stated that the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." Doc. 10-3 at 22. And, consistent with 20 C.F.R. § 416.929, the ALJ's decision explained that, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, [the ALJ] must

consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." Doc. 10-3 at 23.

The ALJ reviewed Whitt's allegations and hearing testimony regarding her pain and other symptoms. Doc. 10-3 at 23, 27. The ALJ stated that Whitt alleges that "her high blood pressure, stroke, depression, anxiety, back problems, and knee problems limit [her] ability to perform work activity," that "her impairments affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, and use her hands," and that "she has difficulty with her memory, completing tasks, concentrating, understanding, following instructions, and getting along with others." Doc. 10-3 at 23.

Then, "[a]fter careful consideration of the evidence," the ALJ found that Whitt's "medically determinable impairments could reasonably be expected to cause *some* of the alleged symptoms." Doc. 10-3 at 13 (emphasis added).

But the ALJ found that Whitt's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record"—for reasons that the ALJ explained in the decision. Doc. 10-3 at 23.

The ALJ's decision thoroughly reviewed Whitt's medical records. The ALJ found that evidence shows that Whitt has "diagnoses of spinal disorder, degenerative joint disease, and osteoarthritis of the knee." Doc. 10-3 at 24. The ALJ also

considered April 2019 imaging of Whitt's left knee, which showed "normal findings with no indication of fracture, osteoarthritis, or effusion," October 2019 imaging of Whitt's lower back, and October 2019 x-rays of Whitt's foot.  Doc. 10-3 at 24.  In this regard, the ALJ's decision demonstrates that the ALJ considered evidence of Whitt's back and knee pain.

The ALJ found that during a consultative examination Dr. Fuller noted that Whitt had a "decreased range of motion," but that she "had no difficulty rising from a seated position."  Doc. 10-3 at 24.  The ALJ also found that "there is no evidence that would preclude the claimant from *sitting* throughout the workday."  Doc. 10-3 at 31 (emphasis added); *see* Doc. 17 at 19.

The ALJ found that, while "the record has shown [Whitt] having some symptoms, the evidence does not support [Whitt] to be as limited as alleged by her spinal disorder, degenerative joint disease, and osteoarthritis of the knee."  Doc. 10-3 at 24.  In support of this finding, the ALJ identified multiple records from Gadsden Regional showing that Whitt had a "normal range of motion," "normal strength," "no tenderness," and "normal alignment."  Doc. 10-3 at 24.

The ALJ also found that Quality of Life records indicated that Whitt had "normal appearing extremities" and was "negative for joint swelling, muscle weakness, and neck pain," and that her symptoms "were relieved by pain medications and rest."  Doc. 10-3 at 24.  The ALJ found that records reported that

Whitt was "negative for extremity weakness, gait disturbances, headaches, and numbness in extremities." Doc. 10-3 at 24. The ALJ again found that "[t]he medical evidence and other evidence in the record does not support [Whitt] to be as limited as alleged by her spinal disorder, degenerative joint disease, and osteoarthritis of the knee." Doc. 10-3 at 25.

With respect to Whitt's hearing testimony, the ALJ found that Whitt "testified as to some issues" adapting and managing herself (Doc. 10-3 at 29), that Whitt reported "being able to handle her own personal care such as being able to bathe herself," and "being able to prepare meals, and that she tries to clean her home once a week and does the laundry." Doc. 10-3 at 20. The ALJ also found that Whitt reported being "able to manage her own finances, and her hobbies are watching television, playing games on her phone, talking on the phone with friends, and texting with friends," and being able to "to go shopping in-store for personal items and cleaning supplies." Doc. 10-3 at 21.

In assessing Whitt's allegations and testimony, the ALJ also noted that while Whitt alleged that her daily activities were limited, Whitt also "reported routinely cleaning her home and exercising regularly." Doc. 10-3 at 27. Consequently, the ALJ found that Whitt's "reported limited daily activities are considered to be outweighed by the other factors discussed" in the ALJ's decision. Doc. 10-3 at 27.

The ALJ considered Whitt's testimony and allegations regarding her mental

impairments and found that, "[w]hile the evidence has shown [Whitt] having some symptoms, the evidence does not support [Whitt] to be as limited as alleged by her mental impairments."   Doc. 10-3 at 27.   The ALJ found that "neurological examinations performed at Quality of Life Health Centers" showed that Whitt had "normal memory," "appropriate mood and affect," and "normal insight and judgment," and that she was "oriented to time place, person, and situation."  Doc. 10-3 at 27.   The ALJ also observed that medical records indicated on multiple occasions that Whitt's depression and anxiety were "controlled with medication." Doc. 10-3 at 27.  And (as noted above), the ALJ found that Whitt repeatedly declined mental health referrals, and that "her complaints regarding her anxiety and depression appear to have diminished and frequently were not even discussed during clinic visits" to Quality of Life.  Doc. 10-3 at 27.

The ALJ also considered "the medical opinions and prior administrative findings" under "the rules set out in 20 C.F.R. § 416.920c."  Doc 10-3 at 27–28.  The ALJ evaluated opinion evidence from the following:  non-examining state agency psychologist, Gloria Roque, PhD; Dr. Nichols' psychological consultative examination report; Dr. Fuller's consultative examination report; and the opinion of the non-examining state agency physician, James A. Stallworth, MD.  Doc. 10-3 at 28–30.

The ALJ found "Dr. Roque's prior administrative findings as to the degree of

limitation in the broad areas of function generally persuasive," but found that Whitt "did have a moderate limitation in the area of adapt or manage oneself as she testified as to some issues in this area."  Doc 10-3 at 28–29.  The ALJ also "found Dr. Roque's opinion as to [Whitt's] mental residual functional capacity only somewhat persuasive as she included multiple limitations and/or recommendations in her residual functional capacity assessment that are not phrased in vocationally relevant terms and do not pertain to any vocational description" in the relevant sources.  Doc. 10-3 at 29.

As discussed above (*see* Part I *supra*), substantial evidence supported the ALJ's findings that "the opinions in the July 31, 2019 psychological consultative examination report provided by clinical psychologist, Dr. Nichols" were not "fully supported by or consistent with the ongoing treatment records."  Doc. 10-3 at 29.

With respect to Dr. Fuller (*see supra*), the ALJ found that Dr. Fuller "did not proffer any opinion as to [Whitt's] ability to perform the physical demands of work," but that his report had "been considered as 'other medical evidence' along with all other evidence in the aggregate."  Doc. 10-3 at 30.

As to the August 16, 2019 opinion of the non-examining state agency physician, Dr. Stallworth, the ALJ found that opinion partially persuasive.  Doc. 10-3 at 30.  The ALJ found that Dr. Stallworth's opinion that Whitt could perform "a restricted range of light work activity with additional postural and environmental

limitations" only partially persuasive because it "did not properly account for [Whitt's] obesity in combination with her other impairments."  Doc. 10-3 at 30.

As noted above, the ALJ also considered the effect of Whitt's obesity on her symptoms and found that, "it is likely that the claimant's obesity is exacerbating these impairments," but that "there is nothing to support the degree of the symptoms she has alleged."  Doc. 10-3 at 31.  The ALJ reiterated that Whitt's "physical examinations are essentially normal but for the noted reduced spinal range of motion in [Dr. Fuller's] physical consultative examination report."  Doc. 10-3 at 31.

Importantly, the ALJ did not entirely discredit Whitt's testimony about her pain and other symptoms.  Instead, the ALJ limited Whitt "to a restricted range of sedentary work," despite "the minimal objective findings noted in the record."  Doc. 10-3 at 31.

Among other things, the ALJ found that the RFC finding "prevents [Whitt] from having to stand or walk for prolonged [periods]," and the ALJ included postural restrictions because "activities such as climbing, balancing, stooping, kneeling, crouching, and crawling could exacerbate or precipitate [Whitt's] symptoms if performed more frequently than indicated."  Doc. 10-3 at 31.  The ALJ also found that "[e]nvironmental conditions that can worsen arthritic type symptoms such as extreme cold and vibration have been limited and [Whitt] is precluded from work in hazardous conditions as a safety precaution."  Doc. 10-3 at 31.

The ALJ also considered Whitt's allegations regarding her mental impairments and found that "the objective medical and other evidence do not support [Whitt's] extreme allegations of an inability to be around others or go into public." Doc. 10-3 at 32. Nonetheless, the ALJ partially credited Whitt's allegations and found that "her impairments could cause some limitations in social interaction given that the evidence of record indicates that she has struggled with social interactions with family and friends in the past." Doc. 10-3 at 32. Consequently, the ALJ found that the RFC "restrict[ed] [Whitt] to occupations requiring no interaction with members of the public." Doc. 10-3 at 32. The ALJ also found that Whitt's "difficulty in focusing and concentrating" would be addressed "by limiting her to simple tasks given that she has the intellectual ability to understand, remember and carry out at least simple work instructions." Doc. 10-3 at 32.

Accordingly, the ALJ found that the RFC finding was "supported by the record, when considered as a whole, especially in light of the course of treatment prescribed to [Whitt] for her impairments, the opinion evidence," and "the medical treatment records," all of which "suggest greater sustained capacity than described by [Whitt]." Doc. 10-3 at 32.

In short, the ALJ's RFC determination accounted for Whitt's subjective testimony regarding her impairments, related pain, and other symptoms, and included the necessary "explicit and adequate reasons" for discrediting Whitt's

subjective testimony that she could not work on account of her physical and mental impairments. *Wilson*, 284 F.3d at 1225. The ALJ "considered [Whitt's] medical condition as a whole," and the decision was not a "broad rejection" of Whitt's subjective testimony. *Dyer*, 395 F.3d at 1210.

Moreover, substantial evidence supported the ALJ's decision not to credit Whitt's subjective testimony regarding her impairments and symptoms, and to find that she was not disabled. As discussed above, the ALJ's decision includes a thorough consideration of the record evidence, including Whitt's function reports and testimony, Whitt's treatment history, the results of objective testing, medical records, and medical opinions in the record. The ALJ appropriately considered Whitt's testimony regarding her pain and other symptoms, and evaluated the objective medical evidence and other evidence to determine what limitations Whitt had because of her impairments.

Given the record evidence and the ALJ's analysis, the court cannot "re-weigh[] the evidence or substitute[e] [its] judgment for that [of the Commissioner] . . . even if the evidence preponderates against the [ALJ's] decision." *Moore*, 405 F.3d at 1213 (citation and quotation marks omitted).

In sum, there is sufficient evidence in the record based on which a reasonable person would accept the ALJ's findings that Whitt's testimony was not consistent with the record, and that Whitt was not disabled. *See Crawford*, 363 F.3d at 1158.

Accordingly, substantial evidence supported the ALJ's decision.

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the court

**AFFIRMS** the Commissioner's decision.  The court separately will enter final

judgment.

     **DONE** and **ORDERED** this September 28, 2022.


_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE